IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

NICHOLAS CEDERBERG and HAYLEY
SHELTON,

                Plaintiffs,

     v.

WASHINGTON COUNTY CONSOLIDATED
COMMUNICATIONS AGENCY; KELLY
DUTRA; DENNIS DOYLE; MARTY WINE;
DON BOHN; MIKE DUYCK; MICHAEL
KINKADE; PAULA PETERSON;
WASHINGTON COUNTY; PAT GARRETT;
ERIC STONEBERG; TIMOTHY DAVID
ZIEGLER, M.D.; NORTHWEST ACUTE
CARE SPECIALISTS, P.C.; LEGACY
HEALTH; LEGACY MERIDIAN PARK
HOSPITAL; MONIQUE ROBERTS; BRECK
PARK-BURSON; KINSEY COYNE;
STEPHANIE LEE; JESSICA MCKENZIE;
KATHRYN FISCHER; ALLISON ORSBORN;
JASON MARCEAU; MELISSA PROCACCINI;
ELIZABETH SMITH; TONY A. COWGER; and
JON NOLAN,

                Defendants.

No. 3:18-cv-02044-HZ

OPINION & ORDER

David D. Park
Elliott & Park
0324 SW Abernethy Street
Portland, OR 97239

Nelson R. Hall
Bennett, Hartman, Morris & Kaplan, LLP
210 SW Morrison Street, Suite 500
Portland, OR 97204

      Attorneys for Plaintiffs

David C. Lewis
Steven A. Kraemer
Kraemer & Lewis
PO Box 1469
Lake Oswego, OR 97035

> Attorneys for Defendants Washington County Consolidated Communications
> Agency, Kelly Dutra, Dennis Doyle, Marty Wine, Don Bohn, Mike Duyck,
> Michael Kinkade, Paula Peterson, Monique Roberts, Breck Park-Burson, Kinsey
> Coyne, Stephanie Lee, Jessica McKenzie, Kathryn Fisher, Allison Osborn, Jason
> Marceau, Melissa Procacinni, Elizabeth Smith, Tony A. Cowger, and Jon Nolan

Kimberly Stuart
Christopher A. Gilmore
Office of the Washington County Counsel
155 N. First Street, Suite 340, MS 24
Hillsboro, OR 97124

> Attorneys for Defendants Washington County, Pat Garrett, and Eric Stoneberg

HERNÁNDEZ, District Judge:

This matter comes before the Court on the following Motions: (1) the Motion to Dismiss

Plaintiffs' Amended Complaint [ECF 27] filed by Defendants Washington County Consolidated

Communications Agency ( "WCCCA"), Kelly Dutra, Dennis Doyle, Marty Wine, Don Bohn,

Mike Duyck, Michael Kinkade, Paula Peterson, Monique Roberts, Breck Park-Burson, Kinsey

Coyne, Stephanie Lee, Jessica McKenzie, Kathryn Fisher, Allison Osborn, Jason Marceau,

Melissa Procacinni, Elizabeth Smith, Tony A. Cowger, and Jon Nolan (collectively the

"WCCCA Defendants"); and (2) the Motion to Dismiss and Motion to Strike [ECF 34] filed by

Defendants Washington County, Pat Garrett, and Eric Stoneberg (collectively the "Washington

County Defendants").

For the reasons that follow, the Court GRANTS the WCCCA Defendants' Motion to

Dismiss [ECF 27] in part insofar as it DISMISSES Plaintiffs' Claim One and the portion of

Claim Four that is derivative of Claim One without prejudice and with leave to amend. The

Court DENIES the WCCCA Defendants' Motion in part to the extent that they seek dismissal of Plaintiffs' claims with prejudice and request the Court consider matters outside the Amended Complaint. In addition, the Court GRANTS the Washington County Defendants' Motion to Dismiss and Motion to Strike [ECF 34] and DISMISSES Plaintiffs' Claims Two, Three, and the portion of Claim Four that is derivative of Claims Two and Three with prejudice.

BACKGROUND

The following facts are taken from Plaintiffs' Amended Complaint [ECF 5] and are assumed to be true at this early stage of the proceedings:

Plaintiff Nicholas Cederberg served as a trooper with the Oregon State Police. Plaintiff Hayley Shelton is married to Cederberg. While on duty on the night of December 25, 2016, Plaintiff Cederberg was shot 12 times by James Tylka, an individual whom law enforcement was pursuing on suspicion of shooting and killing his estranged wife, Katelyn Tylka, earlier that evening.[1]

The Washington County Sheriff's Office, led by Defendant Pat Garrett, previously encountered Tylka on November 29, 2016, after Kaetlyn Tylka called 9-1-1 to report that Tylka had threatened to kill her. Defendant Eric Stoneberg, a Washington County Sheriff's Deputy, conducted an in-person interview with Kaetlyn Tylka. During the course of his investigation Stoneberg determined he had probable cause to arrest Tylka for menacing. Stoneberg located Tylka and interviewed him. During the course of that interview Tylka admitted making the threats to Kaetlyn Tylka. Stoneberg, however, did not arrest Tylka even though Oregon Revised Statute § 133.055(2) provides "when a peace officer responds to an incident of domestic disturbance and has probable cause . . . to believe that one such person has placed the other in

---

[1] The Court refers to James Tylka as "Tylka" in this Opinion and Order. When referring to Kaetlyn Tylka, the Court uses her full name.

fear of imminent serious physical injury, the officer shall arrest and take into custody the alleged assailant or potential assailant."

On November 30, 2016, Tylka attempted suicide by intentionally overdosing on insulin. When police and emergency medical technicians responded to Tylka's home that evening Tylka was "barely conscious" and Katelyn Tylka told police and EMTs that Tylka had been depressed, intentionally tried to overdose on insulin, had recently purchased knives with which he intended to kill Katelyn Tylka and their child, and that police had been called the previous day as a result of Tylka's threats to his wife and child. Am. Compl. ¶ 56. While Tylka was being transported to Defendant Legacy Meridian Park Hospital, a King City police officer seized Tylka's knives and faxed a "Peace Officer Hold" ("POH") form to the hospital. *Id.* ¶ 57. Notwithstanding the POH, Defendant Timothy David Ziegler, M.D., discharged Tylka from the hospital after treating him for the insulin overdose and did not admit Tylka to receive mental-health treatment or seek to have Tylka admitted to another facility to receive emergency mental-health care.

In his capacity with OSP, Cederberg was assigned to patrol in Washington County on December 25, 2016. WCCCA provides dispatch services for law enforcement in Washington County. WCCCA uses three channels for dispatch – South Cities ("SC"), Sheriff's Office One ("SO1"), and Sheriff's Office Two ("SO2"). OSP communications equipment was not capable of monitoring the WCCCA radio dispatch communications. Accordingly, WCCCA issued "pack sets" to OSP troopers assigned to Washington County. OSP troopers using those pack sets, however, could only monitor a single WCCCA channel at a time.

At approximately 10:15 p.m. on December 25, 2016, Tylka shot and killed Kaetlyn Tylka. At approximately 10:35 p.m., Defendant Breck Park-Burson, the dispatcher assigned to SC, issued a county-wide request for all law enforcement to attempt to locate ("ATL") a white

Mitsubishi vehicle driven by Tylka. That ATL included an advisory that Tylka was armed with a handgun. Approximately three minutes later, Defendants Jessica McKenzie and Allison Orsborn broadcast the ATL on SO1 and SO2, respectively, but Plaintiffs allege neither dispatcher mentioned that Tylka was suspected of murder, that he was armed with a handgun, or that he may have been suicidal.

At 10:38 p.m. Cederberg heard the ATL broadcast on SO1 and, approximately two minutes later, informed WCCCA on SO1 that he was active on the ATL. At approximately 10:40 p.m. WCCCA broadcast on SC that Tylka was a homicide suspect and that he was suicidal. Cederberg did not receive that information because he was only monitoring SO1.

At approximately 10:41 p.m., an OSP dispatcher called WCCCA and spoke with Defendant Kathryn Fischer to advise WCCCA that Cederberg was active on the ATL. Fischer told OSP Dispatch that the ATL was for a homicide suspect but did not inform the OSP dispatcher that James Tylka was armed or suicidal.

At approximately 10:49 p.m. Cederberg notified WCCCA that he had located Tylka's vehicle and was in pursuit. Plaintiff alleges that "[a]t and after 10:49" he made tactical decisions regarding his pursuit of Tylka, including that he would activate his lights and siren; follow Tylka without a cover officer; and pursue Tylka down a narrow, dark, and relatively isolated rural dead-end road. Plaintiffs allege WCCCA failed to inform Cedeberg that Tylka was armed and suicidal before he decided to take these actions. At approximately 10:52 p.m., Tylka rammed his vehicle into Cederberg's patrol car while simultaneously initiating a gun battle during which Tylka shot Cederberg 12 times. Cederberg survived the shooting, but was seriously injured.

Plaintiffs bring four claims that are relevant to the WCCCA Defendants and the Washington County Defendants. In Claim One Cederberg brings a claim against the WCCCA

Defendants under 42 U.S.C. § 1983 on the basis that the WCCCA Defendants violated substantive due process under the state-created danger doctrine when they sought assistance with locating and apprehending Tylka, but did not provide Cederberg sufficient information to do so safely.[2] In Claim Two Cederberg brings a procedural due-process claim under § 1983 against Defendant Stoneberg on the basis that Stoneberg deprived Plaintiff of a protected liberty interest without due process when Stoneberg failed to arrest Tylka on November 29, 2016, notwithstanding a duty to do so under § 133.055(2). In Claim Three Plaintiff Cederberg brings a procedural due-process claim against Defendants Pat Garrett and Washington County under a *Monell* theory on the basis that their failure to train Stoneberg on his duties under § 133.055(2) was the moving force behind Cederberg's injuries. Finally, in Claim Four Plaintiff Shelton brings a claim under § 1983 for deprivation of her right to family association that is derivative of Claims One, Two, and Three.[3]

On January 18, 2019, the WCCCA Defendants filed their Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) in which they seek dismissal of Cederberg's Claim One and the portion of Shelton's Claim Four that is derivative of Claim One. The Washington County Defendants filed their Motion to Dismiss on February 1, 2019, in which they seek dismissal of Cederberg's Claims Two and Three and that portion of Shelton's Claim Four that is derivative of Claims Two and Three pursuant to Rule 12(b)(6). In their Motion the Washington County Defendants alternatively move the Court to strike paragraphs 51 and 52 of Plaintiffs' Amended

---

[2] Cederberg seeks to hold WCCCA and Defendants Kelly Dutra, Dennis Doyle, Marty Wine, Don Bohm, Mike Duyck, and Michael Kinkade (collectively, the "Policy-Maker WCCCA Defendants") liable under Claim One on the basis that their "policy of inaction" and their failure to adequately train the WCCCA dispatchers were the "moving force" behind the dispatchers' failure to provide Cederberg with adequate information. Pls.' Resp. [ECF 38], at 16; s*ee also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).

[3] Plaintiffs' Claim Five is not at issue in the Motions before the Court.

Complaint pursuant to Rule 12(f) on the basis that the allegations in those paragraphs are irrelevant to this case.

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept all material facts alleged in the complaint as true and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett–Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). However, the court need not accept unsupported conclusory allegations as truthful. *Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir. 1992); *see also Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) ("[W]e do not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations") (internal quotation marks and alterations omitted). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[,]" meaning "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

## DISCUSSION

As noted, the WCCCA Defendants and the Washington County Defendants moved to dismiss Plaintiffs' Amended Complaint for failure to state a claim under Rule 12(b)(6).

I.       WCCCA Defendants' Motion to Dismiss

The WCCCA Defendants move to dismiss Cederberg's Claim One and that portion of Shelton's Claim Four that is derivative of Claim One on the basis that (1) the WCCCA dispatchers, in fact, informed Cederberg that Tylka was armed and that he was a homicide suspect notwithstanding the allegations in Plaintiffs' Amended Complaint to the contrary; (2) in any event, Cederberg has failed to adequately plead affirmative state action that created a danger to him; and (3) Cederberg's *Monell* theory against WCCCA and the Policy-Maker WCCCA Defendants fails because Plaintiffs do not allege a cognizable underlying constitutional violation or facts sufficient to establish any actionable policy, custom, or failure to train. Finally, the WCCCA Defendants contend the relevant portion of Shelton's Claim Four fails because it is derivative of Cederberg's Claim Two.

A.       Consideration of Materials Outside the Complaint

As a threshold matter, the WCCCA Defendants assert the Court should consider two sets of documents outside the Amended Complaint when deciding their Motion: (1) transcripts of dispatch communications and (2) a transcript of an interview investigators conducted with Cederberg after the incident. The WCCCA Defendants contend the dispatch transcripts are integral to the Amended Complaint and, therefore, the Court should consider them as though they were part of the Amended Complaint when deciding the WCCCA Defendants' Motion. With respect to the interview transcript, the WCCCA Defendants assert the Court should take judicial notice of it as a public record.

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). On a

motion to dismiss the court may "consider materials incorporated into the complaint or matters of public record." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

### 1. Incorporation by Reference of the Dispatch Transcripts

The incorporation-by-reference doctrine is intended to "prevent[] plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja*, 899 F.3d at 1002. The court may consider a document incorporated by reference into the complaint when the complaint "'refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Id.* (quoting *United States v. Ritchie*, 342 F3d 903, 907 (9th Cir. 2003)). The "mere mention of the existence of a document," however, is insufficient to justify incorporation by reference. *Coto Settlement*, 593 F.3d at 1038. Although a document is properly considered on a Rule 12(b)(6) motion in the "rare instances when assessing the sufficiency of a claim requires that the document at issue be reviewed," a document should not be considered if it "merely creates a defense to the well-pled allegations in the complaint." *Khoja*, 899 F.3d at 1002. Thus, "[a]lthough the incorporation-by-reference doctrine is designed to prevent artful pleading by plaintiffs, the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim." *Id.* at 1003.

Moreover, "what inferences a court may draw from an incorporated document should also be approached with caution." *Id.* Although "a court 'may assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6),'" the court may not "assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* (quoting *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)).

Plaintiffs do not contest the authenticity of the dispatch transcripts submitted by the WCCCA Defendants or object to the Court's consideration of those transcripts even though they are not part of the Amended Complaint. To the contrary, in their Response [ECF 38] Plaintiffs supplement the WCCCA Defendants' transcripts with additional dispatch transcripts. *See* Decl. of David Park [ECF 39].

Nonetheless, the dispatch transcripts that the parties have provided to the Court are heavily excerpted and/or redacted, disorganized, and unclear as to which radio channel(s) from which they are drawn. *See* Decl. of Raechelle Ottosen [ECF 28] Exs. 2, 3; Park Decl. Ex. 4; Second Ottosen Decl. [ECF 41] Exs. A, B. For example, the Park and Second Ottosen Declarations attach transcript excerpts from a channel identified as "SC1." *See* Park Decl. Ex. 4; Second Ottosen Decl. Ex. B. The parties, however, do not refer to an "SC1" channel in either the Amended Complaint or in their briefing and do not explain this discrepancy. Although at times the parties seem to indicate the "SC1" channel is the same as the "SC" channel, the Court observes that the "SC1" transcript excerpt attached to the Park Declaration contains statements from Cederberg, which could seemingly contradict Plaintiffs' allegations that Cederberg was only active on SO1. *See* Am Compl. ¶¶ 26(k), 32, 34 (indicating Cederberg could only monitor and transmit on one channel at a time and alleging Cederberg was using SO1); Pls.' Resp. [ECF 38], at 5 ("Because plaintiff was monitoring and transmitting on channel SO1, he is unaware that the vehicle is operated by a homicide suspect that is armed and suicidal.").

The distinctions between the channels are critical in this case because Plaintiffs' claims rely on the proposition that the WCCCA Defendants did not timely provide important officer-safety information to Cederberg before and during his pursuit of Tylka. Because the transcripts in the form submitted by the parties do not make clear (1) what information was conveyed on

which channel and (2) when that information was conveyed, the Court would have to make impermissibly uncertain inferences from the transcripts to rely on the factual content therein. *See Khoja*, 899 F.3d at 1003 ("[W]hat inferences a court may draw from an incorporated document should also be approached with caution."). Accordingly, the transcripts are insufficiently reliable to be considered at this stage of the proceedings.

In addition, although the parties agree that the Court should consider the transcripts, the Court nonetheless doubts that the transcripts meet the legal requirements to be considered incorporated into the Amended Complaint. Of note, the transcripts are not quoted or mentioned in the Amended Complaint, and although Plaintiffs rely on the substance of the dispatch communications in their claims, the Amended Complaint does not include any verbatim excerpts of those communications. The transcripts are, at most, evidence that either supports (as Plaintiffs contend) or contradicts (as the WCCCA Defendants contend) the allegations in the Amended Complaint. Such documents are ordinarily inappropriate for consideration on a Rule 12(b)(6) motion. *Khoja*, 899 F.3d at 1002. Accordingly, even if the transcripts were presented to the Court in a clear and reliable manner, the Court would be reluctant to consider them at this early stage of the proceedings.

On this record, therefore, the Court declines to consider the transcripts of the dispatch communications attached to the parties' briefs.

### 2. *Transcript of Post-Incident Interview*

The WCCCA Defendants also contend the Court should take judicial notice of the transcript of an interview between Cederberg and investigators after the incident. The WCCCA Defendants contend that transcript is subject to judicial notice because it is a public record. In

particular, the WCCCA Defendants rely on the following statements by Cederberg from the transcript:

> Okay, I responded to a murder suspect who had fled in a vehicle, um, I knew the vehicle description, um, and that there was a male involved. I came into contact with that vehicle, um, outside Sherwood Oregon. Immediately a pursuit ensued where the suspect shot multiple rounds at me in my patrol car. Um, that came to a dead end road where I had stopped and the suspect, uh, began driving directly towards me and felt that due to everything I knew at the time that my life was in danger, um, I decided to fire my weapon and use deadly force, um, which resulted in injuries to both of us, ultimately the suspect's death.

Ottosen Decl. [ECF 28] Ex. 4, at 2. The WCCCA Defendants also point out that during that interview Cederberg's then-counsel indicated that they felt "the . . . best evidence of what occurred . . . that night is the audio, video and . . . radio traffic." *Id.* Ex. 4, at 1. Based on this interview the WCCCA Defendants assert "plaintiff confirmed that he knew the danger that he faced at the time of the encounter with Tylka." WCCCA Defs' Mot. [ECF 27], at 9.

A court may consider materials outside the complaint if those materials are properly subject to judicial notice. *Khoja*, 899 F.3d at 998. "Judicial notice under [Federal] Rule [of Evidence] 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Id.* at 999 (quoting Fed. R. Evid. 201(b)). "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Id.* (quoting Fed. R. Evid. 201(b)(1)–(2)). A court, however, may not take judicial notice of "disputed facts contained in such public records." *Id.*

Even assuming the transcript of the interview is the type of public record of which the Court can properly take judicial notice, the WCCCA Defendants rely on the transcript for the disputed proposition that Cederberg was aware of the danger Tylka posed before he encountered Tylka. That is, at best, an inference drawn from disputed facts contained within the transcript and, accordingly, is not appropriately subject to judicial notice.

On this record, therefore, the Court concludes it cannot take judicial notice of the transcript of the post-incident interview with investigators for the purpose asserted by the WCCCA Defendants. Accordingly, the Court will decide the WCCCA Defendants' Motion on the basis of only the facts alleged in the Amended Complaint.

B.    Merits of the WCCCA Defendants' Motion

As noted, the WCCCA Defendants move to dismiss Cederberg's Claim One and the portion of Shelton's Claim Four that is derivative of Claim One on the basis that (1) the WCCCA dispatchers, in fact, communicated the critical information to Cederberg, contrary to the allegations in the Amended Complaint; (2) Cederberg has failed to adequately plead any affirmative state action that created a danger to him; and (3) Cederberg's *Monell* theory against WCCCA and the Policy-Maker WCCCA Defendants fails because Plaintiffs do not allege a cognizable underlying constitutional violation or facts sufficient to establish any actionable policy, custom, or failure to train. Finally, the WCCCA Defendants contend even if Plaintiffs have stated a claim in Claim One, the individual WCCCA Defendants are nonetheless entitled to qualified immunity.

*1.    Communication of the Critical Information*

The WCCCA Defendants' first basis for dismissal relies on consideration of the dispatch transcripts and the transcript of the post-incident interview. As noted, the Court declines to consider the dispatch transcripts and post-incident interview on this Rule 12(b)(6) Motion, and instead relies only on the facts pleaded in the Amended Complaint. In the Amended Complaint Plaintiffs allege the WCCCA Defendants did not communicate the critical information to Cederberg and that he made critical tactical decisions regarding his pursuit of Tylka that would he would not have made if he had been properly informed of Tylka's dangerousness. *See* Am

Compl. [ECF 5] ¶¶ 23–40. Accordingly, the Court declines to dismiss Cederberg's Claim One or, in turn, the relevant portion of Shelton's Claim Four on this basis.

2.    *Affirmative State Action Creating Danger to Cederberg*

"[A]lthough the Constitution protects a citizen's liberty interest in her own bodily security the state's failure to protect that interest does not violate the Fourteenth Amendment, unless one of two exceptions applies: (1) the special relationship exception, or (2) the state-created danger exception." *Campbell v. State of Wash. Dep't of Soc. and Health Servs.*, 671 F.3d 837, 842 (9th Cir. 2011). The special-relationship exception does not apply to this case because a special relationship is only "created when 'the State takes a person into its custody and holds him there against his will.'" *Id.* (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)).

The state-created danger exception, on the other hand, "creates the potential for § 1983 liability where a state actor 'creates or exposes an individual to a danger which he or she would not have otherwise faced.'" *Id.* (quoting *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006). State actors may be held liable under § 1983 when they (1) "affirmatively place an individual in danger" by (2) "acting with 'deliberate indifference to [a] known or obvious danger in subjecting the plaintiff to it.'" *Kennedy*, 439 F.3d at 1062 (quoting *Munger v. City of Glasgow*, 227 F.3d 1082, 1086 (9th Cir. 2000); *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996)(*Grubbs II*)).

As to the first element, "[a] plaintiff must show not only that the defendant acted 'affirmatively,' but also that the affirmative conduct placed him in a 'worse position than that in which he would have been had [the state] not acted at all.'" *Pauluk v. Savage*, 836 F.3d 1117, 1124 (9th Cir. 2016)(Fletcher, J., writing for the court)(quoting *Johnson v. City of Seattle*, 474

F.3d 634, 641 (9th Cir. 2007)); *see also id.* at 1128 (Murguia, J., concurring in part and dissenting in part). The danger affirmatively created by the state actor must be an "actual, particularized danger" that the plaintiff "would not otherwise have faced." *Kennedy*, 439 F.3d at 1063. Moreover, the "ultimate injury" to the plaintiff must be foreseeable. *Lawrence v. United States*, 340 F.3d 952, 957 (9th Cir. 2003).

With respect to the second element, "[d]eliberate indifference is 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Patel v. Kent School Dist.*, 648 F.3d 965, 974 (9th Cir. 2011)(quoting *Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)). "Deliberate indifference is a higher standard than gross negligence because it 'requires a culpable mental state,' meaning that '[t]he state actor must 'recognize[ ] [an] unreasonable risk and actually intend[ ] to expose the plaintiff to such risks without regard to the consequences to the plaintiff.'" *Campbell*, 671 F.3d at 846 (quoting *Patel*, 648 F.3d at 974)(alterations in original). "In other words, the defendant 'knows that something is going to happen but ignores the risk and exposes [the plaintiff] to it.'" *Patel*, 648 F.3d at 974 (quoting *Grubbs II*, 92 F.3d at 900)(alteration in original).

The WCCCA Defendants contend Plaintiffs have failed to allege Cederberg's injuries were caused by any affirmative action on the part of the WCCCA Defendants because the critical occurrence that gave rise to the dangerous situation was an omission by state actors; *i.e.*, the WCCCA Defendants' alleged failure to advise Cederberg that Tylka was armed and suicidal. Plaintiffs, on the other hand, contend the WCCCA Defendants acted affirmatively when they issued the ATL in which they requested assistance of all law enforcement to locate Tylka, but then failed to ensure Cederberg was advised of critical officer-safety information when he responded to that call.

The Ninth Circuit has only once addressed a situation like this case in which the plaintiff was a state employee who alleged other state actors created a danger to them during the course of their employment. *L.W. v. Grubbs*, 974 F.2d 119, 120 (9th Cir. 1992)(*Grubbs I*). In *Grubbs I* the plaintiff was hired to work in the medical clinic at a medium-security correctional institution. *Id.* at 120. The plaintiff alleged the prison officials who hired L.W. "led her to believe that she would not be required to work alone with violent sex offenders." *Id.* Nonetheless, L.W. alleged the prison officials later selected an inmate, Blehm, to work alone with L.W. in the clinic who was a "violent sex offender who had failed all treatment programs at the institution" and who "was considered very likely to commit a violent crime if placed alone with a female." *Id.* Blehm "assaulted, battered, kidnapped and raped" L.W. once he was alone with her. *Id.*

In assessing L.W.'s § 1983 claim on the basis of a state-created danger, the Ninth Circuit found L.W.'s status as a state employee did not provide a basis to defeat her claim. *Id.* at 122. Applying the state-created-danger standard, the Ninth Circuit found:

> [T]he actions of the Defendants created the danger to which L.W. fell victim by elevating Blehm to cart boy status. According to the complaint, the Defendants knowingly assigned Blehm to work with L.W. despite their knowledge that: (1) Blehm was not qualified to serve as a cart boy; (2) Blehm had an extraordinary history of unrepentant violence against women and girls; (3) Blehm was likely to assault a female if left alone with her; (4) L.W. would be alone with Blehm during her rounds; and (5) L.W. would not be prepared to defend against or take steps to avert an attack because she had not been informed at hiring that she would be left alone with violent offenders.

*Id.* at 121. Accordingly, the Ninth Circuit concluded the defendants in *Grubbs I* "used their authority as state correctional officers to create an opportunity for Blehm to assault L.W. that would not otherwise have existed" and "enhanced L.W.'s vulnerability to attack by misrepresenting to her the risks attending her work." *Id.* The Ninth Circuit, therefore, found L.W. properly stated a claim under the state-created-danger doctrine. *Id.* at 122.

The allegations in this case are distinguishable from *Grubbs I* in critical respects regarding whether the allegations sufficiently establish affirmative state action to create the danger. For example, unlike in *Grubbs I*, where prison officials specifically selected Blehm to work alone with L.W., in this case Plaintiffs allege Cederberg responded to a general call to all law enforcement to attempt to locate Tylka. There is not any allegation that any of the WCCCA Defendants specifically assigned Cederberg to respond to the ATL. *Grubbs I*, therefore, provides little support for Plaintiffs' contention that issuing the ATL while allegedly failing to provide all necessary officer-safety information on a radio channel that Cederberg was monitoring constitutes sufficient affirmative government conduct to be actionable under a state-created-danger theory. Moreover, whereas in *Grubbs I* L.W. was affirmatively misled as to the possibility of working alone with a violent sex offender, Plaintiffs in this case only allege a failure to inform Cederberg of critical information. Again, in this respect Plaintiffs' allegations focus on the omissions of the WCCCA Defendants whereas the *Grubbs I* court relied on the affirmative conduct of state actors.

At bottom, the WCCCA Defendants' allegedly unconstitutional actions were their alleged omissions in failing to provide necessary information to Cederberg during his pursuit of Tylka. That Cederberg began that pursuit as a result of an all-law-enforcement ATL call-out in the course of Cederberg's ordinary duties as an OSP trooper does not convert the alleged failure to provide all necessary officer-safety information from an omission into affirmative action. On this record, therefore, the Court concludes Plaintiffs have failed to allege sufficient affirmative state action to state a claim under the state-created danger doctrine.

Plaintiffs' allegations also fall short of establishing the WCCCA Defendants acted with deliberate indifference to a known or obvious danger. Although Plaintiffs allege the WCCCA

Defendants knew OSP troopers carried the WCCCA pack sets that only allowed them to monitor one channel at a time and that Cederberg at one point communicated with WCCCA on SO1, Plaintiffs do not allege that they were aware that Cederberg *only* monitored SO1 during the relevant period and, therefore, they do not allege that the WCCCA Defendants knew or that it was obvious to the WCCCA Defendants that Cederberg did not have the critical officer-safety information. To the contrary, Plaintiffs allege "[a]bsent direct confirming radio communication with a responding OSP Trooper, WCCCA *could not know* whether the OSP Trooper had received critical information about the incident." Am. Compl. ¶ 26(q)(emphasis added). Plaintiffs allege the WCCCA Defendants failed to verify that Cederberg had received the critical information. *Id.* ¶ 36.

As noted, in order to establish that the WCCCA Defendants were deliberately indifferent to a known or obvious danger to Cederberg, they must allege that the WCCCA Defendants recognized an unreasonable risk and actually intended to subject Cederberg to that risk. *Campbell*, 671 F.3d at 846. Plaintiffs' allegations, therefore, cannot establish deliberate indifference because they acknowledge that the WCCCA Defendants "could not know whether [Cederberg] ha[d] received critical information about the incident." Am. Compl. ¶ 26(q). The WCCCA Defendants, therefore, at most negligently failed to ensure Cederberg received the critical information. Even gross negligence is insufficient to establish deliberate indifference because gross negligence does not require that "the defendant knows that something is going to happen but ignores the risk and exposes someone to it." *Grubbs II*, 92 F.3d at 900.

Accordingly, the Court concludes Plaintiffs' pleadings are insufficient to establish either affirmative state action that created the danger to Cederberg or that the WCCCA Defendants acted with deliberate indifference in light of that danger.

### 3. *Monell Theory Against Policy-Maker WCCCA Defendants*

As noted, Plaintiffs bring Claim One against the Policy-Maker WCCCA Defendants and WCCCA on a *Monell* theory. With respect to the *Monell* prong of Claim One, Plaintiffs allege:

> Defendants Kelly Dutra, Dennis Doyle, Marty Wine, Don Bohn, Mike Duyck and Michael Kinkade (collectively "WCCCA Policy Makers"), acting as final policy makers for Defendant WCCCA, knowingly and intentionally directed, authorized or approved WCCCA to request aid and assistance from OSP Troopers within their jurisdiction for Washington County law enforcement agencies on high risk incidents, without adopting, instituting or requiring policies, procedures, training and supervision that would ensure that they provide responding, aiding or assisting OSP Troopers with critical officer safety information concerning such incidents.

Am. Compl. ¶ 78.

Under *Monell* "a municipality may not be held liable for a § 1983 violation under a theory of *respondeat superior* for the actions of its subordinates." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016). "In order to establish municipal liability, a plaintiff must show that a 'policy or custom' led to the plaintiff's injury." *Id.* (quoting *Monell*, 436 U.S. at 694). In order to lead to the plaintiff's injury, the policy or custom at issue must be the "moving force" behind the constitutional violation that the plaintiff suffered. *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007). The policy or custom that led to the plaintiff's injury must also "'reflect[] deliberate indifference to the constitutional rights'" of the municipality's inhabitants. *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 392 (1989)).

Because Plaintiffs rely on the same state-created-danger claim for the underlying constitutional violation with respect to the *Monell* prong of Claim One as they do with respect to the other WCCCA Defendants, Plaintiffs' *Monell* claim fails because they have not adequately alleged an underlying constitutional violation.

### 4. *Qualified Immunity*

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "[Q]ualified immunity is 'an immunity from suit rather than a mere defense to liability.'" *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Accordingly, the court must "'resolv[e] immunity questions at the earliest possible stage in litigation.'" *Id.* at 232 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

When analyzing a qualified-immunity question, the court applies a two-step process. First, a court "must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Id.* "Second . . . the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts have discretion regarding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

As noted, Plaintiffs have failed to allege a violation of a constitutional right in Claim One. In any event, even if Plaintiffs had alleged an underlying violation of a constitutional right in Claim One, this Court would nonetheless find the individual WCCCA Defendants are entitled to qualified immunity.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)(quoting *Reichle v. Howards*, 555 U.S. 658, 664 (2012)). Courts "'do not require

a case directly on point'" to defeat a claim of qualified immunity, "'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)); *see also Greisen v. Hanken*, 925 F.3d 1097, 1108 (9th Cir. 2019). In conducting this analysis, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742)(emphasis in original). "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)); *see also City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019).

In this instance Plaintiffs have not presented any closely analogous authority that would place it "beyond debate" that a dispatcher would violate the constitutional rights of a police officer by giving the officer only some, but not all available officer-safety information regarding an active dispatch call. This is especially true where, as here, Plaintiffs fail to allege the dispatchers knowingly withheld information or intentionally misled Cederberg. Accordingly, the Court concludes the individual WCCCA Defendants are entitled to qualified immunity on Claim One.

For these reasons, the Court grants the WCCCA Defendants' Motion to Dismiss and dismisses Cederberg's Claim One and the portion of Shelton's Claim Four that is derivative of Claim One.

II.    Washington County Defendants' Motion to Dismiss

As noted, the Washington County Defendants move to dismiss Cederberg's Claims Two and Three, and the corresponding portion of Shelton's Claim Four, pursuant to Federal Rule of Civil Procedure 12(b)(6). In the alternative the Washington County Defendants move to strike

paragraphs 51 and 52 of Plaintiffs' Amended Complaint pursuant to Rule 12(f) on the basis that the allegations in those paragraphs are irrelevant.

A.     Claim Two – Procedural Due Process Against Defendant Stoneberg

As noted, in Claim Two Cederberg brings a procedural due-process claim under § 1983 against Defendant Stoneberg on the basis that Stoneberg deprived Plaintiff of a protected liberty interest without due process when Stoneberg failed to arrest Tylka on November 29, 2016, despite an alleged duty to do so under Oregon Revised Statute § 133.055(2). The Washington County Defendants move to dismiss Claim Two and the corresponding portion of Claim Four on the bases that (1) Cederberg has not alleged an adequate causal connection between the alleged deprivation of his liberty interest and the ultimate injuries he sustained; (2) § 133.055(2) cannot give rise to a protected liberty interest for Cederberg because he is not a member of the class protected by that statute; (3) Plaintiffs' allegations fail to state a violation of procedural due process such that Cederberg cannot establish a constitutional violation; and (4) Stoneberg is entitled to qualified immunity.

*1.     Causation*

The Washington County Defendants move to dismiss Claim Two as to Stoneberg because the allegations in Plaintiffs' Amended Complaint fail to establish a sufficient causal connection between Stoneberg's alleged failure to arrest Tylka on November 29, 2016, and Tylka shooting Cederberg almost a month later on December 25, 2016. In making this argument the Washington County Defendadnts contend both that Stoneberg's failure to arrest Tylka lacks a sufficient causal connection with the December 25, 2016, shooting and that, in any event, the actions of Defendants Legacy Meridian Park Hospital and Dr. Ziegler broke the causal chain between Stoneberg's actions and the shooting.

"In a § 1983 action, the plaintiff must . . . demonstrate that the defendant's conduct was the actionable cause of the claimed injury." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). To establish causation "the plaintiff must show that (a) the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct; and (b) the act was the 'proximate cause' or 'legal cause' of the injury, meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017)(quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 582–83 (7th Cir. 2012)); *see also Harper*, 533 F.3d at 1026.

The Court finds Plaintiffs' allegations fail to demonstrate that Stoneberg's failure to arrest Tylka on November 29, 2016, was a cause-in-fact of Tylka shooting Cederberg almost a month later on December 25, 2016. Under the allegations in the Amended Complaint a finder of fact would have to impermissibly speculate whether Tylka would have murdered his estranged wife and shot Cederberg on December 25, 2016, even if Stoneberg had arrested Tylka nearly a month earlier. Plaintiffs, for example, do not allege any facts from which a rational finder of fact could conclude that Tylka would have remained in custody through December 25, 2016, and, therefore, would not have had the opportunity to shoot Kaetlyn Tylka and Cederberg that night. Determining whether the arrest would have otherwise interrupted the chain of events that led to Tylka shooting Cederberg is similarly a practice in impermissible speculation. Although in some instances a rational factfinder could draw the necessary causal connection from the proximity in time between the allegedly causal event and the resulting occurrence, the temporal connection in this case is far too attenuated to do so. Accordingly, the Court concludes Plaintiffs have not established sufficient causation-in-fact to sustain Claim Two.

The Court also finds Plaintiffs' allegations do not establish proximate causation as to Claim Two. As an initial matter, the Court finds Tylka shooting Cederberg while fleeing law enforcement after murdering Kaetlyn Tylka is not the type of injury that a reasonable person would see as a likely result of Stoneberg failing to arrest Tylka almost a month earlier. *See Spencer*, 857 F.3d at 798. In any event, "[t]he inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Because the protected liberty interest in Plaintiffs' Claim Two arises from Stoneberg's alleged violation of § 133.055(2), the Court assesses whether Tylka shooting Cederberg was foreseeable in light of the standards applied to § 133.055(2).

In *Nearing v. Weaver*, 295 Or. 702, 670 P.2d 137 (1983), the Oregon Supreme Court considered whether the mandatory-arrest provisions in Oregon Revised Statute § 133.310(3) give rise to a civil action in the event that injuries arise from a failure to make such a mandatory arrest. That statute provides:

> A peace officer shall arrest and take into custody a person without a warrant when the peace officer has probable cause to believe that: (a) [t]here exists an order issued pursuant to [statutes] restraining the person; (b) [a] true copy of the order and proof of service on the person has been filed as required in [statutes]; and (c) [t]he person to be arrested has violated the terms of that order.

Or. Rev. Stat. § 133.310(3). The court began its analysis by noting the statute was enacted "to strengthen legal protection for persons threatened with assault by a present or former spouse or a cohabitant." *Nearing*, 295 Or. at 138. The Oregon Supreme Court further noted "[t]he statutes in this case, ORS 133.310(3), and its companion, ORS 133.055, are unique among statutory arrest provisions because the legislature chose mandatory arrest as the best means to reduce recurring domestic violence." *Id.* at 143. Because the court found § 133.310(3) created a "specific duty

imposed by statute" the court concluded the statute gave rise to a civil cause of action separate

from traditional tort law. *Id.* at 140–41. In doing so, the *Nearing* court observed that an allegation

of negligence in an ordinary case "invoke[s] a duty to take reasonable care not to cause a risk of

a foreseeable type of harm to a foreseeable class of plaintiffs." *Id.* at 141. With respect to the

mandatory-arrest statute, however, the Oregon Supreme Court observed that "the risk, the harm,

and the potential plaintiff were all foreseen by the lawmaker." *Id.* Oregon courts, therefore, have

treated proximate or legal causation under mandatory-arrest statutes (like § 133.055(2) in this

case) as a function of the class of risks and persons that the particular statute was intended to

protect. *See Deckard v. Bunch*, 358 Or. 754, 761–62, 370 P.3d 478 (2016)(discussing

foreseeability in the context of statutory liability and noting that with certain statutes "[t]he

legislature already may have determined that, when a defendant's conduct violates the statute,

that conduct creates a foreseeable risk to persons in the plaintiff's position.").

When a claim for civil relief arises from a statute, Oregon courts have been reluctant to

find that parties not identified under those statutes have a claim for such relief. For example, in

*McAlpine v. Multnomah County*, the plaintiff was violently attacked by Charlesworth, who at the

time was paroled from Oregon State Penitentiary where he served a period of incarceration for a

controlled-substance offense. 131 Or. App. 136, 138, 883 P.2d 869 (1994). During the period in

which Charlesworth attacked the plaintiff, Charlesworth was subject to an order requiring law

enforcement to arrest him for a parole violation. *Id.* at 138–39. Rather than arrest Charlesworth,

however, law enforcement surveilled him as part of an ongoing drug investigation. *Id.* at 138–39.

The plaintiff in that case brought an action against Multnomah County for its failure to arrest

Charlesworth on the parole-violation order in part under Oregon Revised Statute § 144.331,

which provides:

The State Board of Parole and Post–Prison Supervision may suspend the parole or post-prison supervision of any person under its jurisdiction upon being informed and having reasonable grounds to believe that the person has violated the conditions of parole or post-prison supervision and may order the arrest and detention of such person. The written order of the board is sufficient warrant for any law enforcement officer to take into custody such person. A sheriff, municipal police officer, constable, parole or probation officer, prison official or other peace officer *shall* execute the order.

*Id.* at 144 (quoting Or. Rev. Stat. § 144.331(1))(emphasis added). The Court of Appeals, however, found "nothing on the face of that statute, or in the surrounding provisions of chapter 144, that suggests that it was meant to protect members of the general public from criminal activities perpetrated by parole violators." *Id.* at 145. In distinguishing *Nearing*, the court observed that the statutes at issue in *Nearing* (Oregon Revised Statutes §§ 133.055 and 133.310(3)) were "intended to protect the plaintiff named in the restraining order from abuse by her estranged husband, who was also named in the order." *Id.* at 146. Because the purpose of § 144.331(1) was "not to protect a particular class of persons or to prevent a particular type of harm," the court found the *McAlpine* plaintiff could not state a cause of action for statutory liability. *Id.* at 147.

Plaintiffs contend risks to police officers responding to reports of domestic violence fall within the scope of the risks that the legislature foresaw and sought to prevent in passing § 133.055(2). Plaintiffs argue that incidents of domestic violence present greater danger to officers than many other types of calls, and that the legislature intended to include officers within the scope of domestic-violence victims protected by the mandatory-arrest provision in § 133.055(2) because arresting the perpetrator in the first instance would reduce the chance that future officers would have to respond to subsequent incidents of domestic violence.

Notably, however, Plaintiffs do not point to any authority on the face of the statute, in its legislative history, or in caselaw that indicates risks to officers responding to subsequent

domestic-violence incidents were among the risks that the legislature foresaw and sought to minimize in passing § 133.055(2). In fact, as the *Nearing* and *McAlpine* courts noted, on its face § 133.055(2) is clear in its intention to reduce the risk of harm to the non-assailant in an incident of domestic violence or menacing "between family or household members." *Or. Rev. Stat.* § 133.055(2)(a).

Accordingly, on this record the Court concludes risks to police officers responding to subsequent incidents of domestic violence were not among the risks that the legislature foresaw and sought to minimize in passing § 133.055(2). Because the alleged violation of § 133.055(2) is the basis of the alleged deprivation of Cederberg's protected liberty interest in Claim Two, Plaintiffs have failed to establish that the alleged violation of § 133.055(2) was the proximate cause of Cederberg's injuries.

On this record, therefore, the Court concludes Cederberg's Claim Two should be dismissed.[4] For the same reasons the portion of Shelton's Claim Four that is derivative of Claim Two must also be dismissed.

> ### 2. Protected Liberty Interest

The Washington County Defendants next contend § 133.055(2) cannot give rise to a protected liberty interest such that the violation thereof can provide the basis for a procedural due-process violation and § 1983 claim because Cederberg is not within the class of persons protected by § 133.055(2).

"The Due Process Clause of the Fourteenth Amendment provides that no state shall 'deprive any person of life, liberty, or property, without due process of law....'" *Carver v.*

---

[4] Because the Court concludes Plaintiffs have failed to establish a causal connection, the Court need not determine whether the actions of Dr. Ziegler or Legacy Meridian Park Hospital were intervening factors that broke the causal chain.

*Lehman*, 558 F.3d 869, 872 (9th Cir. 2009)(quoting U.S. Const. amend. XIV, §1). In assessing statute-created property interests the deprivation of which give rise to a due-process claim in the context of a mandatory-arrest statute the Supreme Court noted that "[e]ven if the statute could be said to have made enforcement of restraining orders 'mandatory' because of the domestic-violence context of the underlying statute, that would not necessarily mean that state law gave *respondent* an entitlement to *enforcement* of the mandate." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 764–65 (2005)(emphasis in original). Accordingly, a plaintiff who claims the deprivation of a protected interest that was created by statute must demonstrate that the plaintiff is among the class of persons in whom the legislative body intended to create the protected interest.[5] *Id.* at 764–66. The Court noted it "would expect to see some indication of that in the statute itself." *Id.* at 765.

The Washington County Defendants' argument on this point largely mirrors the proximate-causation analysis. The Court agrees with the Washington County Defendants' argument and concludes, for the reasons stated above, that Plaintiffs cannot allege the deprivation of a protected liberty interest in the mandatory-arrest provision of § 133.055(2) because Cederberg is not among the class of persons that the legislature sought to protect in that statute. Because Plaintiffs cannot establish the deprivation of any protected liberty interest, Plaintiffs have failed to allege an underlying constitutional violation on which to maintain Cederberg's Claim Two or to support that portion of Shelton's Claim Four that is derivative of Claim Two.

---

[5] Although *Castle Rock* analyzed the mandatory-arrest statute at issue in that case under the rubric of a property interest created by statute and Plaintiffs in this case allege the deprivation of a liberty interest created by statute, there is not any apparent reason why that distinction would make a legal difference.

### 3. Failure to State a Procedural Due-Process Claim

The Washington County Defendants next move to dismiss Plaintiffs' Claim Two on the basis that Plaintiffs have otherwise failed to state a procedural due-process claim. On May 29, 2019, the Court directed Plaintiffs to file a supplemental memorandum to provide Plaintiffs an opportunity to articulate the legal theory underlying their procedural due-process claims and to set out their proposed analysis under *Mathews v. Eldridge*, 424 U.S. 319 (1976). Plaintiffs filed their Supplemental Response [ECF 48] on June 7, 2019. The Washington County Defendants filed a Supplemental Reply [ECF 49] on June 14, 2019.

Under *Mathews* courts balance three factors to determine whether a government action violates procedural due process: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. at 334–35. "'Notice and [a meaningful] opportunity to be heard are the hallmarks of procedural due process.'" *Ludwig v. Astrue*, 681 F.3d 1047, 1053 (9th Cir. 2012)(quoting *Guenther v. C.I.R.*, 889 F.2d 882, 884 (9th Cir. 1989)).

In their Supplemental Response, Plaintiffs recharacterize the protected liberty interest at issue in Claim Two as a generalized "freedom from government aided or imposed infliction of bodily harm." *Id.* at 4. This recharacterization contradicts Plaintiffs' Amended Complaint in which Plaintiffs alleged "ORS 133.055(2) creates a liberty interest for all persons who may be harmed by perpetrators of domestic violence, including law enforcement officers, that is afforded procedural due process protection under the Fourteenth Amendment." Am. Compl. ¶ 87.

Notwithstanding the moving target that Plaintiffs present, the Court concludes Plaintiffs have failed to allege facts from which a rational finder of fact could conclude any state actor "aided or imposed" bodily harm on Cederberg.

In any event, Plaintiffs' Claim Two does not fit neatly within the rubric of procedural due process. Plaintiffs contend the additional process that Cederberg was due is Tylka's mandatory arrest after the November 29, 2016, incident. Plaintiffs, however, fail to cite any authority for the proposition that a state failure to take an action against an individual can establish a failure to provide constitutionally adequate process to a then-unidentified third party. Moreover, it is unclear how a violation of the mandatory-arrest statute deprived Cederberg of notice and an opportunity to be heard. Plaintiffs' procedural due-process claim, therefore, is not legally cognizable.

Accordingly, on this record the Court concludes Plaintiffs fail to state a claim under procedural due process and, therefore, Cederberg's Claim Two and the corresponding portion of Shelton's Claim Four must be dismissed on that basis.

### 4. *Qualified Immunity*

In light of the problems with Cederberg's Claim Two identified above, the Court also concludes that, at minimum, no "reasonable official" in Stoneberg's situation would understand that failing to arrest Tylka in violation of § 133.055(2) would violate the constitutional rights of future officers who may be injured while responding to a domestic-violence call involving Tylka. *See Mullenix*, 136 S. Ct. at 308. Accordingly, the Court concludes Stoneberg is entitled to qualified immunity on Claim Two.

On this record, therefore, the Court concludes Cederberg's Claim Two and the corresponding portion of Shelton's Claim Four must be dismissed on this basis.

B.      Claim Three – Procedural Due Process under a *Monell* Theory Against
        Defendants Garrett and Washington County

As noted, Cederberg's Claim Three is a § 1983 claim against Defendants Garrett and

Washington County on a *Monell* theory that Garrett and Washington County failed to train

Defendant Stoneberg on the requirements of § 133.055(2) and that the failure to train was a

moving force behind the constitutional violation set out in Claim Two. Part of Shelton's Claim

Four is derivative of Cederberg's Claim Three.

Cederberg's Claim Three suffers from the same defects as Claim Two. Because Plaintiffs

have failed to establish an underlying constitutional violation that is actionable under § 1983,

Cederberg cannot maintain a claim under a *Monell* theory that the failure to train Stoneberg on

the part of Defendants Garrett and Washington County led to the alleged constitutional violation.

Moreover, because Plaintiffs have not demonstrated that Stoneberg's failure to arrest Tylka was

either a cause-in-fact or the proximate cause of Cederberg's injuries they also cannot establish

that Garrett and Washington County's failure to train Stoneberg on the mandatory-arrest

provision caused Cederberg's injuries.

Accordingly, on this record the Court concludes Cederberg's Claim Three and the portion

of Shelton's Claim Four that is derivative of Claim Three must be dismissed.

III.    Leave to Amend

As noted, the Court has concluded that each of Plaintiffs' claims against the WCCCA

Defendants and the Washington County Defendants must be dismissed pursuant to Rule

12(b)(6). The Court must nonetheless determine whether it should give Plaintiffs an opportunity

to amend their complaint to attempt to restate claims against the WCCCA Defendants and the

Washington County Defendants.

Federal Rule of Civil Procedure 15(a)(2) provides "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." This is "a policy 'to be applied with extreme liberality.'" *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1173 (9th Cir. 2017)(quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)). "District courts generally consider four factors in determining whether to deny a motion to amend: 'bad faith, undue delay, prejudice to the opposing party, and the futility of amendment.'" *In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 701 (9th Cir. 2011)(quoting *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994)).

Whether an amendment will cause undue prejudice to the defendant is the key factor the court must consider when determining whether to grant a motion for leave to file an amended complaint. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). The party who opposes amendment bears the burden to show prejudice. *Adam v. Haw.*, 235 F.3d 1160, 1164 (9th Cir. 2000)(overruled on other grounds)(citing *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987)). In any event, "leave to amend need not be granted when 'any amendment would be an exercise in futility.'" *Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1103 (9th Cir. 2018). Courts, however, should not deny leave to amend on the basis that amendment would be futile "'unless it is clear . . . that the complaint could not be saved by amendment.'" *Id.* (quoting *Eminence Capital*, 316 F.3d at 1052).

The Court readily finds the first three factors weigh in favor of permitting Plaintiffs an opportunity to amend. Because Plaintiffs have not yet had an opportunity for permissive amendment and because Plaintiffs filed this case relatively recently there is not any record from which the Court could find undue delay or prejudice to Defendants. Moreover, there is not any

indication at this stage of the proceedings that Plaintiffs are pursuing this action in bad faith. Accordingly, the Court should grant leave to amend unless Plaintiffs' claims are futile.

As noted, Cederberg's Claim One is deficient because Cederberg failed to adequately allege affirmative state action on the part of the WCCCA Defendants that created a danger to Cederberg or that the WCCCA Defendants acted with deliberate indifference to a known or obvious danger to Cederberg. Although this record creates reason to doubt whether Plaintiffs can plead additional facts from which Plaintiffs can remedy the deficiencies in Claim One because those deficiencies appear fundamental to the facts currently alleged in the Amended Complaint, the record before the Court is not fully developed and the policy of applying Rule 15(a)(2) with "extreme liberality" counsels giving Plaintiffs a chance to remedy the pleading defects.

The Court observes, however, that it appears from the dispatch transcripts submitted in the briefing of the WCCCA Defendants' Motion (but not considered by the Court on that Motion) that Cederberg was informed that Tylka was wanted for homicide and was believed to be armed before Cederberg made the critical decision to follow Tylka down a dark, dead-end street without backup officers. Plaintiffs should consider those transcripts when determining whether they can plead additional facts from which they can make a good-faith argument that they are entitled to relief. In any event, on this record the Court grants Plaintiffs leave to amend Claim One and the corresponding portion of Claim Four. Accordingly, the Court dismisses those claims without prejudice and with leave to amend.

The pleading deficiencies with respect to Claims Two and Three (and the portion of Claim Four that derives therefrom), on the other hand, are so fundamental as to make amendment of those claims futile. There is no conceivable way that Plaintiffs could allege additional facts in good faith that would resolve the causation issues with Claim Two or Three or

place Cederberg within the class of persons protected by § 133.055(2). Accordingly, the Court concludes amendment of Plaintiffs' Claims Two, Three, and the corresponding portion of Claim Four would be futile. Accordingly, the Court dismisses those claims with prejudice and without leave to amend.

## CONCLUSION

For these reasons, the Court GRANTS the WCCCA Defendants' Motion to Dismiss [ECF 27] in part insofar as the Court DISMISSES Plaintiffs' Claim One and the portion of Claim Four that is derivative of Claim One without prejudice and with leave to amend. The Court DENIES the WCCCA Defendants' Motion in part insofar as the WCCCA Defendants seek dismissal of Plaintiffs' claims with prejudice and request consideration of matters outside the Amended Complaint. In addition, the Court GRANTS the Washington County Defendants' Motion to Dismiss and Motion to Strike [ECF 34] and DISMISSES Plaintiffs' Claims Two, Three, and the corresponding portion of Claim Four with prejudice.

If Plaintiffs choose to file a second amended complaint that re-raises claims against the WCCCA Defendants, it is due no later than July 29, 2019. If Plaintiffs choose to file a second amended complaint, the Court directs Plaintiffs to include all claims that are currently pending in this action and to omit all claims and parties that have been dismissed with prejudice.

IT IS SO ORDERED.

DATED this 8 day of July, 2019.

_Marco Hernández_

MARCO A. HERNÁNDEZ
United States District Judge