IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NICHOLAS CEDERBERG and HAYLEY
SHELTON,

               Plaintiffs,

     v.

LEGACY HEALTH, an Oregon corporation,
and LEGACY MERIDIAN PARK
HOSPITAL, an Oregon corporation,

               Defendants.

No. 3:18-cv-02044-HZ

OPINION & ORDER

David D. Park
ELLIOT & PARK, P.C.
324 S. Abernethy Street
Portland, Oregon 97239-4356

Nelson R. Hall
BENNETT HARTMAN MORRIS
210 SW Morrison Street, Suite 500
Portland, OR 97204

     Attorneys for Plaintiff

1 – OPINION & ORDER

Peter O. Tuenge
Jamie Edward Valentine
KEATING JONES HUGHES PC
200 SW Market Street, Suite 900
Portland, Oregon 97201-5730

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      Plaintiffs Nicholas Cederberg and Hayley Shelton bring this medical negligence action against Defendants Legacy Health and Legacy Meridian Park Hospital. Currently before the Court are Defendants' Motion for Summary Judgment [ECF 55] and Plaintiffs' Motion for Leave to File a Second Amended Complaint [ECF 78]. The Court grants both motions.

## BACKGROUND

      As a preliminary matter, the Court accepts the proposed Second Amended Complaint ("SAC") as the operative pleading because the amendments simply "clarify" Plaintiffs' theory of liability and "do not give rise to the need for additional fact discovery nor otherwise prejudice" Defendants. Pls.' Mot. SAC 3-4, ECF 78. Plaintiffs assert Defendants' liability arises from two sources: (1) "the institutional or organizational negligence resulting from [D]efendants' failure to adopt policies and protocols and institute training specific to identification of domestic violent perpetrator patients and properly assess the homicidal and suicidal risks of that particular subset of mental health patients"; and (2) "*respondeat superior* liability for the negligence of its employees Hammond and Nazemi." *Id.* Plaintiffs raised the same negligence theories and made the same factual assertions in their Response [ECF 68] to Defendants' summary judgment motion, which Defendants responded to in their Reply [ECF 73]. The Court finds further briefing is unnecessary because Plaintiffs' amended allegations concern the same general conduct as their previous pleadings—Defendants' failure to admit James Tylka, Jr. ("Tylka") for involuntary

psychiatric treatment. The amended pleadings do not change the underlying analysis or ultimate disposition of this case. The Court will therefore resolve Defendants' arguments for summary judgment in light of the claims alleged in the SAC.

Plaintiffs Nicholas Cederberg ("Cederberg") and Hayley Shelton are husband and wife. At all times relevant, Cederberg was employed as a Trooper with the Oregon State Police. The tragic events giving rise to this action took place on the night of December 25, 2016, when Tylka killed his estranged wife Katelynn Tylka ("Katelynn") with a handgun, and less than an hour later shot Cederberg 12 times, causing him life threatening and permanently disabling injuries. Almost a month before that fatal Christmas night, Defendants Legacy Health and Legacy Meridian Park Hospital, acting through their employees, determined Tylka did not meet the criteria to be admitted for involuntary mental health treatment. The relevant details follow.

On the morning of November 29, 2016, Katelynn called 9-1-1 to report her estranged husband, Tylka, was sending death threats and harassing her over the telephone. A Washington County Sheriff's Deputy investigated the call but did not arrest Tylka. Later that night, Katelynn drove Tylka to Legacy Meridian Park Hospital because he was threatening to commit suicide. Park Decl., Ex. 1, at 5, ECF 69-1. Tylka, a type-1 diabetic, stated his plan was to overdose on his insulin. *Id.* Katelynn informed the triage physician, Dr. Lee, that she recently told Tylka she was "seeing someone else and that exacerbated things." *Id.* She reported Tylka's threats from earlier in the day but noted that she did "not feel threatened currently." *Id.* Dr. Lee recommended Tylka stay at the hospital overnight so he could talk to a social worker in the morning, but he declined. *Id.* at 7. After having a discussion with Tylka, his mother, and Katelynn, Dr. Lee discharged Tylka home to his mother's care. *Id.* at 7-8.

The following day, November 30, 2016, Katelynn called 9-1-1 at 9:21 p.m. to report that Tylka had injected himself with a lethal dose of insulin in her presence. Park Decl. Ex. 3, ECF 69-3. Tylka was transported by ambulance to Legacy Meridian Park Hospital. First Valentine Decl., Ex. 1, at 6-7, ECF 56-1. King City Police Officer Brian Siglor faxed a peace officer's hold form to the hospital which stated, in relevant part: "James Tylka purposely overdosed on insulin. He stated that he is depressed and suicidal. James purchased two knives that he said were to murder his wife and child and then to kill himself. He said he was going to slit his wife's throat." *Id.* at 77. Tylka was admitted to the intensive care unit to treat his insulin overdose. *Id.* at 6-23.

The next day, December 1, 2016, Sharon Hammond, PMHNP ("NP Hammond") conducted a psychological assessment of Tylka. *Id.* at 24-28. She concluded that Tylka was no longer suicidal and did not meet the criteria for an involuntary hold. *Id.* at 28. David Nazemi, MD, discharged Tylka that afternoon with plans for follow-up care. *Id.* at 16-17.

In the weeks following Tylka's discharge from the hospital, he was terminated from his job on December 16th. Second Valentine Decl., Ex. 9, ECF 74-7. He failed to attend follow-up appointments scheduled for December 14th and 19th. *Id.* at Ex. 8, ECF 74-6; First Valentine Decl., Ex. 2, at 19-20, ECF 56-2. And on December 24th, Tylka illegally purchased the gun he used to kill Katelynn and shoot Cederberg with the next day. Second Valentine Decl., Ex. 10, ECF 74-8.

In the early hours of December 25, 2016, Katelynn and Tylka agreed over text message to file for divorce two days later. *Id.* at Ex. 12, ECF 74-10. That afternoon, around 4 p.m., Tylka got into an argument with his ex-wife and her partner while exchanging custody of their son. *Id.* at Ex. 7, at 3, ECF 74-5. His ex-wife's partner grabbed him by the collar during the altercation. *Id.* Later that night, Katelynn met Tylka at his parents' home in King City, Oregon to drop off

their 11-month-old daughter before heading into work. *Id.* at Ex. 11, at 9, ECF 74-9. At approximately 10:15 p.m., Tylka shot and killed Katelynn in the driveway of his parents' home and fled the scene in his car. *Id.* at 2. Approximately 30 minutes later, Cederberg spotted Tylka's vehicle and began pursuing him. *Id.* at 2-3. Tylka initiated a gunfight from his vehicle and shot Cederberg 12 times. Law enforcement officers responded to Cederberg's location where they found him severely injured and rendered aid. *Id.* at 3. Tylka was subsequently killed at the scene. *Id.*

Plaintiffs filed this action on November 26, 2018. In their sole claim for medical negligence, Plaintiffs allege Defendants, directly and acting through their employees NP Hammond and Dr. Nazemi, unreasonably created a foreseeable risk that Tylka would commit future acts of domestic violence and were negligent in one or more of the following particulars:

(a) In failing to properly or adequately assess Tylka for risks of harm to self and others;

(b) In failing to obtain a qualified second opinion concerning Tylka's risk of harm to self and others;

(c) In failing to issue a Notice of Mental Illness for Tylka and/or place Tylka on a physician's hold;

(d) In failing to treat Tylka's mental illness;

(e) In failing to develop and prescribe an adequate plan for disposition and discharge of Tylka;

(f) In discharging Tylka from Legacy Meridian Park Hospital without an adequate and proper follow-up care plan;

(g) In failing to adopt and institute policies, standards, protocols and instruments for identification of patients who are domestic violence perpetrators;

(h) In failing to train physicians, nurses and staff in the identification of patients who are or may be domestic violence perpetrators;

(i) In failing to adopt and institute policies, standards, protocols and instruments for screening and assessment of patients who present with suicidal and/or homicidal ideation, threats and risks within the context of a domestic violence incident; and

(j) In failing to train physicians, nurses and staff in the screening and assessment of patients who present with suicidal and homicidal ideation, threats and risks within the context of a domestic violence incident.

SAC ¶ 53.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The Court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the

existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what inferences should be drawn from them, summary judgment is improper.").

## DISCUSSION

Defendants move for summary judgment on Plaintiffs' medical negligence claim because: (1) Defendants are immune from liability under Oregon Revised Statute § ("O.R.S.") 426.335; (2) Plaintiffs, as non-patients, cannot maintain a claim of medical negligence against Defendants; and (3) Defendants' conduct was not a factual cause of Plaintiffs' injuries. For the reasons discussed, the Court grants summary judgment to Defendants because they are statutorily immune from liability and, even assuming they are not, Defendants' allegedly negligent conduct did not cause Plaintiffs' injuries.[1]

## I.    Immunity under O.R.S. 426.335

O.R.S. Chapter 426 contains Oregon's statutory scheme for the involuntary holding and civil commitment of dangerous persons in need of emergency mental health care. O.R.S. 426.005-426.395; *see also* Or. Admin. R. ("O.A.R."), Ch. 309, Div. 33. Relevant here, a peace

---

[1] Because the statutory immunity and causation arguments are dispositive, the Court finds it unnecessary to address Defendants' contention that they owed no duty to Plaintiffs.

officer is authorized to take a person into custody and transport him or her to the nearest hospital for evaluation if the officer has probable cause to believe the person is dangerous and needs immediate treatment for mental illness. O.R.S. 426.228(1). After being transported to the hospital, a licensed independent practitioner[2] may initiate a "hospital hold" if, after conducting a "face-to-face examination," the practitioner believes the person presents a danger to self or any other person and needs emergency care or treatment. O.R.S. 426.232(1); O.A.R. 309-033-0210(19), 309-033-0250(3). Once a person is placed on a hospital hold, the county and court become involved in assessing the allegedly dangerous person and determining whether the hold will continue. *See*, *e.g.*, O.R.S. 426.234, 426.237; O.A.R. 309-033-0230, 309-033-0240. "However, under no circumstances may the person be held for longer than five judicial days" under a hospital hold. O.R.S. 426.232(2).

In addition, a practitioner may initiate a 12-hour hold to facilitate the transportation of a dangerous person to a treatment facility. O.R.S. 426.231(1). To authorize a "physician's hold," the practitioner must have examined the person within the preceding 12 hours and believe the patient is dangerous to self or others and in need of emergency treatment for mental illness. *Id.*; O.A.R. 309-033-0250. If at any time during a physician's hold or a hospital hold the practitioner determines the patient no longer presents a danger to self or others, the practitioner must discharge the patient. ORS 426.231-32, 426.243; O.A.R. 309-033-0230(1), 309-033-0250(5).

The legislature conferred broad immunity to those involved in the unenviable business of deciding whether to hold people against their will for involuntary mental health treatment. A practitioner or hospital "may not be held criminally or civilly liable for actions pursuant to" the

---

[2] "Licensed independent practitioner" includes physicians and nurse practitioners. O.R.S. 426.005(1)(d).

hospital and physician's hold statutes, provided the practitioner or hospital "act[ed] in good faith, on probable cause and without malice." O.R.S. 426.335(5). The immunity conferred by the statute applies not only to claims brought by a person who was involuntarily held under the statutes, but also to claims brought by third parties "whom that person injures or damages because the [defendant's] negligen[ce] . . . has left the person free to commit the injurious act." *Deming v. Mt. Hood Cmty. Mental Health Ctr.*, 128 Or. App. 164, 167 (1994).

As a threshold matter, O.R.S. 426.335(5) applies to Defendants' allegedly negligent conduct. Concerning the vicarious liability claim, Plaintiffs assert NP Hammond and Dr. Nazemi had the "authority to hold and admit [Tylka] under ORS 426.231 and ORS 426.232," and argue they were negligent in failing to do so. Pls.' Resp. Mot. Summ. J. ("Pls.' Resp.") 14-15, ECF 68. Thus, there is no dispute that the practitioners' decision not to hold Tylka falls within the scope of conduct contemplated by the immunity provision.

Plaintiffs, however, assert Defendants' failure to implement certain policies and training for the assessment and treatment of patients presenting with homicidal or suicidal risk in the domestic violence context is outside the scope of conduct covered by the immunity statute. Pls.' Reply SAC. 10, ECF 90. Specifically, Plaintiffs contend "[t]here is no credible argument that [Defendant] acts 'pursuant to' any of the statutes triggering an immunity analysis when [D]efendants determine whether to adopt or update policies . . . or when [D]efendants determine what training their medical staff is required to have to meet applicable standards of care." *Id.*

Although Plaintiffs' argument has some superficial appeal, it is unpersuasive considering Plaintiffs' theory of liability. According to Plaintiffs, Defendants' "[l]ack of policies, protocol and training necessary to enable staff to meet [their] standard of care in conducting assessments of patients presenting with homicidal and suicidal risk . . . result[ed] in [an] inadequate and

faulty assessment[] and corresponding failure[] to provide proper treatment." *Id.* at 11. Plaintiffs assert Defendants' policies were "wholly inadequate" for "making the decision whether to admit a patient to the hospital for mental health reasons." Pls.' Resp. 10. Under Plaintiffs' theory, Defendants' inadequate policies and training could only harm Plaintiffs *through* NP Hammond's negligent examination of Tylka—an action that was taken "pursuant to" the involuntary hold statutes. O.R.S. 426.335(5).

Moreover, O.R.S. 426.335(5)'s broad grant of immunity would be of little practical value if it could be side-stepped by simply recharacterizing a practitioner's allegedly negligent assessment of a person's dangerousness as the hospital's negligent failure to implement the proper policies and training for the practitioner conducting that assessment. Hospitals act through their practitioners in the context of an involuntary mental-health hold; a practitioner's negligent assessment can almost always be said to result from the hospital's inadequate policies and training. *Cf. Thorson v. Bend Mem'l Clinic*, 291 Or. App. 33, 37 n.1, *review denied*, 363 Or. 481 (2018) (finding, for the purpose of the plaintiff's evidentiary burden, no meaningful distinction between medical malpractice claim and corresponding negligent training and supervision claim "predicated on the assumption that the doctors, absent the proper training and supervision, failed to meet the applicable standards of care, thereby harming plaintiff"). Because a practitioner's assessment of an allegedly dangerous and mentally ill person is covered by O.R.S. 426.335(5), the Court does not see a principled basis for finding a hospital's policies and training relating to that assessment are outside the scope of the statute. Otherwise, the immunity provision's inclusion of hospitals would be "meaningless surplusage." *State v. Stamper*, 197 Or. App. 413, 418 (2005) (citations omitted). The Court therefore finds Defendants were acting pursuant to the

involuntary hold statutes when deciding what policies and training their practitioners should utilize when assessing an individual for an involuntary hold.

Having determined Defendants' allegedly negligent conduct is within the meaning of the limitations provision, Defendants must prove their actions were taken in "good faith, on probable cause, and without malice" to be entitled to the affirmative defense provided by O.R.S. 426.335(5). *Deming*, 128 Or. App. at 166; *Jensen v. Lane Cty.*, 222 F.3d 570, 579 (9th Cir. 2000); *Nash v. Lewis*, 365 F. App'x 48, 52 (9th Cir. 2010). Plaintiffs concede there is no evidence that NP Hammond acted with malice, but they assert there are disputed issues of fact as to whether her decision not to hold Tylka was made in good faith and on probable cause.

### A.    Good Faith

The term "acts in good faith" is not defined by the relevant statutes or regulations. Under Oregon's rules of statutory interpretation, the court assumes "that the word or phrase has its plain, natural, and ordinary meaning." *Matter of Comp. of Muliro*, 359 Or. 736, 745-46 (2016) (citation omitted). "[W]hen a term is a legal one," the court looks to "its 'established legal meaning' as revealed by, for starters at least, legal dictionaries." *Comcast Corp. v. Dep't of Revenue*, 356 Or. 282, 296 (2014) (citation omitted). A court, however, does not "simply consult dictionaries and interpret words in a vacuum," and should also look to the context of the statute to derive a word's meaning. *State v. Cloutier*, 351 Or. 68, 96 (2011).

Plaintiffs argue the term "good faith" should include a constructive knowledge requirement, such that "[a] reasonable juror could find that there is substantial evidence of circumstances in Mr. Tylka's medical records that ought to have put [NP Hammond] to further inquiry" before deciding he did not meet the criteria for a hospital hold. Pls.' Resp. 17. The Court disagrees. O.R.S. 426.335(5)'s "good faith" requirement is not an objective reasonableness

standard. This Court adopts the definition reached by the Maryland Court of Appeals when it

construed a similar immunity statute:

> The phrase "in good faith" refers to the subjective intent or belief of a person at the
> time the person acts or makes a decision. The action may be misguided or the belief
> may be objectively incorrect, but the person acting or making the decision can still
> be acting "in good faith" if he or she actually holds that belief or makes the decision
> without actual knowledge of his or her error. *See Rite Aid Corp. v. Hagley*, 374 Md.
> 665, 680-83, 824 A.2d 107 (2003) (in the context of construing another immunity
> statute, defining "good faith" as to "act with an honest intention"); *see also*
> BLACK'S LAW DICTIONARY (9th ed. 2009) at 762 (defining "good faith" as "a state
> of mind consisting in . . . honesty in belief or purpose").

*Bell v. Chance*, 460 Md. 28, 58 (2018); *see also* BLACK'S LAW DICTIONARY (11th ed.

2019) (defining "[a]cting in good faith" as "[b]ehaving honestly and frankly, without any intent

to defraud or seek an unconscionable advantage").

NP Hammond asserts that she acted in good faith when she evaluated Tylka and

concluded he did not meet the criteria for a hospital hold. Hammond Decl. ¶¶ 2-3, ECF 75.

Plaintiffs have not advanced any argument or evidence to the contrary. Although Plaintiffs

repeatedly assert that NP Hammond failed to meet the applicable standard of care, that does not

address the issue of whether her evaluation of Tylka was conducted in good faith. Accordingly,

Defendants have established the "good faith" element for the statutory immunity defense.

### B.    Probable Cause

Probable cause is also not defined in the relevant statutes or regulations. Oregon courts,

however, have analogized probable cause in Chapter 426 to the definition set out in O.R.S.

131.005[3] and held it is defined as "a substantial objective basis for believing that more likely

than not a person is mentally ill." *State v. Smith*, 71 Or. App. 205, 211 (1984); *Liu v. Portland*

---

[3] "'Probable cause' means that there is a substantial objective basis for believing that more likely
than not an offense has been committed and a person to be arrested has committed it." O.R.S.
131.005.

*State Univ.*, No. 3:14-CV-00908-BR, 2016 WL 2892525, at *7 (D. Or. May 17, 2016). "The determination of probable cause is a legal, not a factual, conclusion. Probable cause does not require certainty." *Pyles v. Winters*, No. 1:12-CV-00346-CL, 2013 WL 3475331, at *4 (D. Or. July 9, 2013) (quoting *State v. Herbert*, 302 Or. 237, 241 (1986)). Therefore, "the issue is not whether [Tylka] was in fact mentally ill," but whether Defendants assessed whether there was "a substantial objective basis for believing that more likely than not" Tylka was a danger to himself or others and in need of emergency treatment for mental illness. *Id.* (citation omitted); O.R.S. 426.232(1). In analyzing probable cause, "the court must consider the totality of the circumstances presented to the [practitioner] and reasonable inferences that may be drawn from those circumstances; no single factor is dispositive." *Liu*, 2016 WL 2892525, at *7 (citation omitted).

Plaintiffs, again, argue that NP Hammond's evaluation of Tylka and collateral-source investigation fell below the standard of care; however, that is not the question before the Court. Defendants are immune from liability if NP Hammond acted on probable cause, i.e., made a good-faith determination of whether, at the time of her evaluation, there was "a substantial objective basis for believing" Tylka was a danger to self or others and in need of emergency treatment. *Smith*, 71 Or. App. at 211.

NP Hammond observed that Tylka was "pleasant and cooperative with a fairly matter-of-fact attitude," his thought process was organized, and he was alert and oriented to name, place, president, and situation. First Valentine Decl., Ex. 1, at 27. His judgment and insight appeared to be improving, although he minimized issues with drugs and alcohol. NP Hammond noted Tylka had no previous psychiatric history, no significant trauma history, and presented in the context of going through a separation from his wife. *Id.* He had also recently found out his wife was seeing

someone else and stated that was "the last straw." *Id.* He had taken a dangerously large dose of insulin in an apparent suicide-attempt. *Id.* Tylka reported that he "told 911 on the scene that he had made a mistake," was "not going to put [him]self through this ever again," and could not "believe it happened th[at] time." *Id.* He endorsed difficulty with sleep, depression, and anxiety. *Id.* He denied suicidal or homicidal ideation at the time of NP Hammond's evaluation, and was agreeable to outpatient mental health follow up and medication management. *Id.*

NP Hammond noted Tylka's risk factors included "recent [suicide] attempt with lethal means; no current outpatient treatment; intermittent comorbid substance use; [and] going through a separation." *Id.* at 26. His protective factors included "no current voiced suicidal ideation; desire for treatment and medication management; children and family, [and] very goal oriented." *Id.* With respect to Tylka's threats of harm to others, NP Hammond reasonably concluded that the issues with Katelynn had likely been resolved because she brought him to the hospital after he threatened her. *Id.* at 25. Tylka also reported that although he had threatened to harm the person Katelynn was seeing, he no longer felt that way. *Id.* NP Hammond noted there were no guns in Tylka's home, and his mother was comfortable with him being discharged with follow-up care. *Id.*

Based on her examination, NP Hammond diagnosed Tylka with depression, anxiety, and polysubstance use disorder. *Id.* at 27. She discussed starting Tylka on an antidepressant but ultimately deferred prescribing medication until he established outpatient care. *Id.* at 28. NP Hammond concluded that Tylka "shows goal-directed thinking, easily contracts for safety, and is very interested in mental health followup. He does not meet criteria for a Notice of Mental Illness and declines inpatient psychiatry; hence, he can legally discharge[.]" *Id.*

As the foregoing demonstrates, NP Hammond acted on probable cause in her assessment of Tylka's eligibility for a mental-health hold. She evaluated whether there was "a substantial objective basis for believing" that Tylka, "more likely than not," was "dangerous to self or to any other person" and "in need of emergency care or treatment for mental illness," and reasonably concluded there was not a sufficient basis to hold him.[4] *Smith*, 71 Or. App. at 211; O.R.S. 426.232. Tylka's lack of a psychiatric history, lack of a present-intent to harm himself or others, display of goal-directed thinking, and desire to pursue outpatient mental health treatment were objective reasons for believing that Tylka did not meet the dangerousness requirements for a hospital hold. Accordingly, Defendants have met their burden with respect to the probable cause element of the statutory defense.

Because Defendants have established that their evaluation and discharge of Tylka were made in good faith, on probable cause, and without malice, they are statutorily immune from liability. The Court therefore grants summary judgment to Defendants on Plaintiffs' medical negligence claim.

## II.    Causation

Defendants contend Plaintiffs' claim also fails because the causal connection between Defendants' conduct and Plaintiffs' injuries is too attenuated. Assuming, without deciding, that

---

[4] As mentioned, Tylka's criminal conduct giving rise to this lawsuit did not occur until 24 days after NP Hammond's evaluation of him, following several other significant events, e.g., being fired from his job, altercations with his family, ultimately buying a gun, deciding to get divorced, etc. That is not to suggest, however, that the mere passage of a significant amount of time without incident will excuse a physician's lack of probable cause. But where, as here, a practitioner conducts a thorough examination of an individual and explains her reasoning for concluding the individual is not dangerous to self or others, the fact that the individual does not harm themselves or others in the days and weeks following their discharge indicates that the physician's determination was reasonable.

Plaintiffs have alleged a cognizable theory of medical negligence based solely on concepts of general foreseeability, Plaintiffs must still demonstrate that Defendants' conduct was the cause-in-fact of their injuries. *Chapman v. Mayfield*, 358 Or. 196, 205 (2015); *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or. 329, 340 (2004) ("A plaintiff, of course, still must prove 'factual' or 'but-for' causation—that there is a causal link between the defendant's conduct and the plaintiff's harm[.]"). Factual causation "generally requires evidence of a reasonable probability that, but for the defendant's negligence, the plaintiff would not have been harmed." *Joshi v. Providence Health Sys. of Oregon Corp.*, 198 Or. App. 535, 538-39 (2005), *aff'd*, 342 Or. 152 (2006) (citing *Horn v. Nat'l Hosp. Ass'n*, 169 Or. 654, 679 (1942)). "In negligence cases generally, 'the proof of the material issue of causation must have the quality of reasonable probability, and a mere possibility that the alleged negligence of the defendant was the proximate cause of the plaintiff's injuries is not sufficient.'" *Trees v. Ordonez*, 354 Or. 197, 218 (2013) (quoting *Sims v. Dixon*, 224 Or. 45, 48 (1960)) (internal bracketing omitted). "It is well established that the causal connection between the defendant's acts or omissions and the plaintiff's injuries must not be left to surmise or conjecture." *Sims*, 224 Or. at 48. "The rule of reasonable probability also applies to expert witnesses." *Id.* (citations omitted).

Defendants note that this Court already dismissed a previously named defendant from this case because:

> [A] finder of fact would have to impermissibly speculate whether Tylka would have murdered his estranged wife and shot Cederberg on December 25, 2016, even if [Deputy] Stoneberg had arrested Tylka nearly a month earlier. Plaintiffs, for example, do not allege any facts from which a rational finder of fact could conclude that Tylka would have remained in custody through December 25, 2016, and, therefore, would not have had the opportunity to shoot Kaetlyn Tylka and Cederberg that night. Determining whether the arrest would have otherwise interrupted the chain of events that led to Tylka shooting Cederberg is similarly a practice in impermissible speculation.

Op. & Order 23, ECF 50. Defendants argue the Court should similarly decide Plaintiffs' medical negligence claim fails as a matter of law because the causal link, if any, between Defendants' negligent discharge of Tylka and him killing Katelynn and shooting Cederberg 24 days later is entirely speculative. Defendants further argue Plaintiffs' claim premised on Defendants' "failure to adopt policies and protocols and institute training specific to identification of domestic violent perpetrator patients and properly assess the homicidal and suicidal risks of that particular subset of mental health patients" should also fail for lack of causation. Pls.' Mot. SAC 4.

In response, Plaintiffs contend that the testimony of their expert witnesses "establishes that, but for [D]efendants' negligence in fail[ing] to properly assess James Tylka, Jr.'s dangerousness, initiate a hospital hold and implement an appropriate follow-up care plan 'the harm to others inflicted by Mr. Tylka on December 25, 2016 more likely than not would not have occurred.'" Pls.' Resp. 22 (quoting Mohandessi Decl. 10, ECF 70). According to Linda O'Malia, PhD, LCSW, but for Defendants' failure to hold Tylka, he would not have killed his estranged wife and shot Cederberg 24 days later because:

> The course of [Tylka's] future violence more likely than not would have been altered by . . . initiation of psychiatric treatment when he was medically stabilized, leading to reduction of symptoms. [Katelynn] was getting a restraining order, which would have been in place. Working with hospital staff, had she been properly counseled by the hospital staff concerning risk, she might have been able to recognize her risk more fully and connect with help such as a women's shelter. He would have had access to counseling as well as milieu therapy as his hold continued.

O'Malia Decl., Ex. 2 ("O'Malia Report"), at 4, ECF 72-2.

Similarly, Soroush Mohandessi, MD, FAPA, contends that the standard of care "required referral [of Tylka] to an intensive outpatient program (IOP) with structure, support and supervision." Mohandessi Decl. 9. An IOP consists of "individual and group meetings with mental health practitioners . . . five days per week for four to eight hours per day[.]" *Id.* Dr.

Mohandessi's expectation for a case such as Tylka's is that he "would complete a four-week course of treatment in the IOP program and then be stepped-down to routine out-patient appointments with community providers." *Id*.

When viewing the evidence in the light most favorable to Plaintiffs, the experts' opinions do not indicate that Defendants' discharge of Tylka was a factual cause of him shooting Cederberg 24 days later. If anything, the experts demonstrate the highly speculative nature of Plaintiffs' theory of causation. As was the case with Deputy Stoneberg, Plaintiffs do not allege any facts from which a rational factfinder could conclude that Tylka would have remained under a hospital hold through December 25, 2016, such that he would not have had the opportunity to shoot Cederberg. Indeed, Defendants could have only held Tylka for a maximum of five days. Dr. O'Malia asserts that if she were to have been assigned as the court-appointed investigator of Tylka's case, she "absolutely would have recommended commitment on the basis of danger to self and danger to others." O'Malia Report 4. Notably missing from Dr. O'Malia's report, however, is any indication as to whether a court would have agreed with her and civilly committed Tylka for involuntary psychiatric treatment. Thus, a jury would have to impermissibly speculate as to whether a court would have signed off on Tylka's involuntary commitment before it could conclude that Plaintiffs' injuries would not have occurred but for Defendant's negligence.

Because Plaintiffs cannot show Defendants could have physically prevented Tylka from causing Plaintiffs' injuries, a factfinder would have to speculate as to whether a hospital hold of Tylka would have interrupted the chain of events leading up to Christmas Day. This would be an impermissible exercise in guessing what *might* have occurred under a host of theoretical possibilities. For example, if Defendants placed Tylka under a hospital hold, there is no way of

knowing whether Tylka would have been released within a few hours or days. As mentioned, a practitioner "shall release" a person detained pursuant to a hospital hold "whenever the physician makes the determination that the person is not dangerous to self or others." O.A.R. 309-033-0250(5)(c); *see also* Mohandessi Decl. 9 (noting "[i]n the majority of cases, the hold is dropped because the patient does not or no longer meets the legal criteria"). Even assuming Defendants held Tylka for the five-day statutory maximum, a finder of fact would still have to speculate as to the efficacy of the "milieu therapy" that would have been available to Tylka during that short period of time. O'Malia Report 4.

Additionally, Dr. O'Malia's opinion that "[t]he course of [Tylka's] future violence more likely than not would have been altered" by a hospital hold was, in large part, based on her assumption that Katelynn would have obtained a restraining order against Tylka. *Id.* However, an email sent by Officer Siglor informing his colleagues about the peace officer's hold on Tylka notes that Katelynn had already abandoned her plan to get a restraining order before he was discharged from the hospital. Second Valentine Decl., Ex. 6, ECF 74-4.

Dr. Mohandessi's opinion that Tylka's participation in a four-week long intensive outpatient therapy program would have prevented Plaintiffs' injuries also fails to demonstrate causation. Plaintiffs do not claim Defendants could have compelled Tylka's participation in a weekslong therapy program, nor could they. Such a significant deprivation of an individual's personal liberty can only be ordered by a court. *See*, *e.g.*, O.R.S. 426.095. As discussed, Plaintiffs have not put forward any evidence from which a factfinder could properly find that a court would have civilly committed Tylka and ordered him to undergo mental health treatment against his will.

Furthermore, the evidence demonstrates that Tylka declined to stay in the hospital overnight so he could meet with a social worker in the morning. Park Decl., Ex. 1, at 7. A few days after he was discharged from the hospital, a social worker employed by Defendants called to arrange outpatient care and mailed him a list of three mental health providers that were taking on new patients. First Valentine Decl., Ex. 2, at 1, 7. However, there is no indication that Tylka ever followed up on mental health treatment, and he failed to attend two follow-up medical appointments. *Id.* at 19-20; Second Valentine Decl., Ex. 8. Therefore, there is no evidence from which a factfinder could reasonably conclude that Tylka would have voluntarily participated in an intensive four-week long therapy program had it been offered to him.

Finally, the experts' opinions fail to explain how a hospital hold could have prevented the numerous, intervening events that transpired in the 24 days between Defendants' assessment of Tylka and him shooting Cederberg. As discussed, Tylka lost his job two weeks after he was discharged from Defendants' care, he unlawfully purchased the gun the day before the shootings, and he agreed to file for divorce and got into a physical altercation with his ex-wife's partner just hours before killing Katelynn and shooting Cederberg. *Id.* at Ex. 7, at 2-10; Ex. 13, ECF 76. A finder of fact cannot be asked to reasonably conclude that had Defendants held Tylka, it would have changed the criminal activity he engaged in 24 days later. *See Piazza v. Kellim*, 360 Or. 58, 79 (2016) (noting "that 'it is difficult if not impossible . . . to predict when a criminal might strike,' and 'if a criminal decides on a particular goal or victim, it is extremely difficult to remove his every means for achieving that goal.'") (quoting *Wiener v. Southcoast Childcare Centers, Inc.*, 32 Cal. 4th 1138, 1147, 1150 (2004)); *Buchler v. State By & Through Oregon Corr. Div.*, 316 Or. 499, 511-12 (1993) ("[M]ere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not

cause the harm so as to support liability for it.") (footnote omitted). Absent speculation, Plaintiffs cannot show that Defendants' alleged negligence caused their harm. Accordingly, Defendants have demonstrated there are no disputed issues of fact and they are entitled to summary judgment as a matter of law.

## CONCLUSION

For the reasons discussed, Plaintiffs' Motion for Leave to File a Second Amended Complaint [ECF 78] and Defendants' Motion for Summary Judgment [ECF 55] are granted.

IT IS SO ORDERED.


DATED:_____September 28, 2020


_____
MARCO A. HERNÁNDEZ
United States District Judge